# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

SHELBY D.,

      Plaintiff,

v.                                         CIVIL ACTION NO. 3:22-cv-00234

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

      Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Shelby D. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (ECF No. 2.) Presently pending before this Court are Claimant's Brief in Support of Complaint (ECF No. 9), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 13). Subsequently, Claimant filed her Reply Brief (ECF No. 15), and the Commissioner filed a Notice of Supplemental Authority (ECF No. 16), followed shortly thereafter by the Commissioner's Notice of Second Supplemental Authority (ECF No. 17). Accordingly, this matter has been fully briefed and is ripe for adjudication. Having fully considered the record and the arguments of the parties, and for the reasons explained more fully herein, Claimant's request to reverse the Commissioner's decision (ECF No. 9) is **DENIED**, the Commissioner's request to affirm

her decision (ECF No. 13) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

## I.    BACKGROUND

### A.  *Information about Claimant and Procedural History of Claim*

Claimant was 51 years old at the time of her alleged disability onset date and 53 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 16, 184, 393.)[1] She has a general equivalency diploma ("GED"). (Tr. 20.) She has past work experience as a customer service representative and business sales agent. (Tr. 44.) Claimant alleges that she became disabled on September 22, 2018, due to post-traumatic stress disorder ("PTSD"), carpal-tunnel syndrome, back and neck impairments, anxiety, depression, and fibromyalgia. (Tr. 31-32, 176-177, 467.)

Claimant protectively filed her applications for DIB and SSI on September 17, 2019, and also filed an application for Disabled Widow's Benefits ("DWB") on September 19, 2019. (Tr. 173, 390-407.) Her claims were initially denied on November 12, 2019, and again upon reconsideration on or about February 18, 2020. (Tr. 68-70, 83-85, 98-100, 113-115, 132-134, 151-153.) Thereafter, on or about April 24, 2020, Claimant filed a written request for hearing. (Tr. 271-277.) An administrative hearing was held before an ALJ by telephone on December 8, 2020; Plaintiff, who was represented by counsel, and a vocational expert ("VE") appeared and testified at the hearing. (Tr. 14-50.) On December 17, 2020, the ALJ entered an unfavorable decision. (Tr. 170-191.) Claimant then sought review of the ALJ's decision by the Appeals Council on January 15, 2021. (Tr. 376-379.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

The Appeals Council granted Claimant's request for review on January 4, 2022, and considered additional evidence subsequently submitted by Claimant's counsel. (Tr. 4.) On March 25, 2022, the Appeals Council entered an unfavorable decision. (Tr. 4-8.) While the Appeals Council's decision agreed with the vast majority of the ALJ's decision, the Council rejected the ALJ's interpretation of the VE's testimony and attendant step-four finding that Claimant was capable of performing her past relevant work. (Tr. 6.) However, the Council agreed with the ALJ's ultimate conclusion that "the claimant can perform a significant number of jobs existing in the national economy based on her assessed residual functional capacity ("RFC")," and therefore was "not disabled as defined in the Social Security Act." (Tr. 7.) The Appeals Council's March 25, 2022 decision serves as the final decision of the Commissioner of the Social Security Administration (the "Agency"). (Tr. 1.)

Claimant timely brought the present action on May 22, 2022, seeking judicial review of the Agency's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The Commissioner filed an Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8). Claimant subsequently filed her Brief in Support of Complaint (ECF No. 9), and in response, the Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 13). Claimant then filed her Reply in Support of Defendant's Decision. (ECF No. 15.) As such, this matter is fully briefed and ripe for adjudication.

**B. Relevant Evidence**

The undersigned has considered all evidence of record pertaining to Claimant's arguments, including the testimony introduced at the December 8, 2020 hearing.

### 1. *Physical Impairments*

Although Claimant has a history of spine issues and brief hospitalizations from tripping over objects, her treatment for these issues was conservative overall, with primarily unremarkable physical examinations. For instance, in September 2018 Claimant reported to her healthcare provider that she tripped over a telephone cord and fell, hitting her head on her nightstand. (Tr. 826.) She went to the emergency room where a CT scan of her brain was normal, and while an image of her neck reflected degenerative changes, there was no indication of an acute process. (Tr. 829.) She was discharged that same day with a diagnosis for concussion and an ankle sprain. (Tr. 828.)

In October 2018, Claimant followed up with a neurologist, where she continued to report concussion symptoms. (Tr. 662.) On examination, Claimant's neurological function was observed to be normal, including normal strength, sensation, reflexes, coordination, gait, and station. (Tr. 662.) Additionally, Claimant's electroencephalogram ("EEG") was unremarkable. (Tr. 658-59.) Later that same month, a cervical spine MRI was also generally unremarkable; the MRI did indicate degenerative-disc disease with cervical spondylosis, subtle reversal of lordosis, and minimal cord impingement at the C5-6 vertebrae, but there was no evidence of myelopathy, spinal cord abnormality, or disc herniation, and only minimal canal stenosis. (Tr. 649.)

Claimant followed up with her neurologist in November 2018, where she reported improvement in her concussion symptoms and denied any issues with headaches, dizziness, memory, or nausea; however, she did report increased neck pain resulting in numbness of the hands. (Tr. 653.) An electromyogram ("EMG") indicated mild-median neuropathy at the wrist and some denervation suggestive of cervical polyradiculopathy. (Tr. 657.) On examination, Claimant demonstrated normal muscle

strength, sensation, and reflexes; she ambulated with a normal gait and station and demonstrated normal coordination. (Tr. 655.) Further, it was noted that Claimant did not use an assistive device. *Id.* Furthermore, while Claimant began physical therapy in November 2018, she discontinued this treatment shortly thereafter. (Tr. 772-780, 790.) In December 2018, Claimant had a consultation with a new neurologist; on physical examination, her condition was found to be generally unremarkable with full strength and sensation. (Tr. 758.) The neurologist recommended that Claimant continue with conservative treatment. (Tr. 759.)

In January 2019, Claimant presented for a pain-management consultation. (Tr. 831.) On examination, Claimant demonstrated stiffness in her neck, but it was also noted that she was ambulating with an unassisted gait, was able to sit comfortably, and had intact cranial nerves, normal deep tendon reflexes, normal motor strength, and normal sensation *Id.* At a follow-up appointment a few months later in March 2019, Claimant's examination demonstrated "some discomfort" with ambulation, tenderness and positive-facet-loading maneuvers in her lumbar spine, trigger points in her thoracic spine, and a straight-leg raise that was positive for back pain. (Tr. 676.) However, there was no indication of Claimant's need for, or use of, an assistive device to ambulate; further, she demonstrated intact reflexes, no acute neurological deficits, and was negative for sciatica. *Id.* The provider's conservative recommendation was two sessions of lumbar-facet-joint injections. *Id.*

A few days later, Claimant went to the emergency department complaining of back pain. (Tr. 682-83.) On examination, Claimant was negative for any weakness or numbness; additionally, a lumbar spine x-ray showed no significant issues, and while a cervical-spine x-ray indicated moderate-to-severe left-foraminal stenosis at the C5-6

vertebral level due to degenerative-disc-disease, all other vertebrae indicated only minimal-to-mild degenerative-disc changes. (Tr. 686-88.)  Similarly, a lumbar-spine MRI in June 2019 reflected a mild disc bulge with mild bilateral-foraminal stenosis, minimal facet-degenerative-joint disease, and minimal-to-no significant issues at any other vertebral level. (Tr. 693.)  Additionally, Claimant demonstrated a normal  gait, with no spinal- point tenderness, as well as a negative straight- leg raise at appointments with her primary-care provider in June 2019. (Tr. 898-902.)

In September 2019, Claimant reported that she tripped over another telephone cord at work, resulting in an emergency- department visit. (Tr. 700.)  She denied experiencing any extremity numbness, sensation changes, tingling, weakness, or burning, and on examination had normal motor strength, range of motion, and sensation. (Tr. 701.)  An image of her cervical spine revealed only minimal degenerative changes and scoliosis. (Tr. 702-03.)  At a follow-up later that month, Claimant demonstrated some tenderness and pain in her spine, but otherwise showed generally normal findings with full strength. (Tr. 891.)  In October 2019, Claimant exhibited normal sensation, good motor strength throughout, and a negative straight-leg raise. (Tr. 721.)  Later that same month, Claimant reported to another healthcare provider that her neurologist explained she "ha[d] the spine of a 20-year-old," but she was prescribed a cane to assist with her ability to maintain balance while ambulating. (Tr. 733, 740.) There was no mention of any assistive device on examination, and Claimant was noted to demonstrate no distress or spine-point tenderness with a negative straight-leg raise. *Id*. The same results were noted in on follow-up in November and December 2019. (Tr. 729.)

At a follow-up appointment in February 2020, Claimant continued to report significant symptoms; for the first time, she had "multiple fibromyalgia tender points

noted," but on examination she demonstrated no spine-point tenderness, she had a negative straight-leg raise, and she was not observed to be making use of any assistive device. (Tr. 747.)  Claimant's next appointment was not until April 2020, where she had a telehealth appointment with her primary-care physician; however, the appointment was limited to discussing medication refills.  (Tr.  893.)  There is no record evidence of any further medical appointments for her relevant physical impairments after this date.

### 2.   Mental-Health Impairments

Claimant's treatment for her alleged mental-health impairments was quite conservative overall, and was limited primarily to medication; additionally, she presented to a healthcare provider for counseling sporadically. There was no evidence that Claimant received any inpatient treatment or hospitalization related to these impairments. Based upon the record it appears that this treatment managed her symptoms, as Claimant reported an "overall decrease in mood and anxiety symptoms" in response to mental-health treatment in March, July, and October of 2019. (Tr. 706-709.) Furthermore, while Claimant did report a depressed mood at times, her mental-status examinations were generally unremarkable—with normal orientation, thought process, associations, thought content, perception, judgment, insight, fund of knowledge, memory, attention, concentration, and affect. (Tr. 706-707, 709-710, 712-713, 715-716, 727, 729, 735, 747, 784, 802, 805, 808, 841, 886-887, 907.)

### 3.   Other Evidence

As to Claimant's mental-health impairments, state-agency psychological consultants Gary Perry, Ed.D, and Alex Guerrero, M.D., found Claimant's mental impairments were non-severe. (Tr. 77, 92-93, 107-08, 124-25, 144, 162-63.)

Regarding Claimant's physical impairments, state-agency medical consultants

Kerri Aaron, M.D., and Stephen Spanbauer, M.D., found Claimant could lift twenty pounds occasionally and ten pounds frequently, as well as sit for six hours—and stand/walk for six hours—out of an eight-hour workday. (Tr. 79, 94, 109, 127, 146, 164-165.) Dr. Aaron and Dr. Spanbauer both found that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 79-80, 94-95, 109-10, 127-28, 146-47, 165.)  However, while Dr. Aaron found that Claimant could occasionally climb ladders, ropes, and scaffolds with no environmental limitations, Dr. Spanbauer found that Claimant could never climb ladders, ropes, or scaffolds, and as to environmental limitations Dr. Spanbauer found that Claimant should avoid even moderate exposure to vibration and hazards. *Id.*

Finally, a Worker's-Compensation form drafted on September 3, 2019, directed Claimant not to life more than five pounds and to refrain from any prolonged sitting or standing until further follow-up. (Tr.  411).  While it is not clear from the record, it appears that the form was completed by Angel Adkins, APRN-FNP. *Id.*

### 4.  *Claimant's Testimony*

At her hearing before the ALJ held on December 8, 2020, Claimant testified, among other things, regarding her education and work experience. (Tr. 26.) Claimant testified that, despite having substantial earnings in her records, she only worked for approximately one month after her alleged onset date until she fell at work in September 2019. (Tr. 19-22, 425-426.) She is "halfway through" a course in medical billing/coding at a technical college; her past work experience includes a position at a call center as a customer service representative. *Id.* Turning to her physical and impairments, Claimant testified that she was diagnosed with degenerative disc disorder of the cervical and lumbar spine, and scoliosis; additionally, she has bilateral carpal-tunnel syndrome, anxiety, panic

8

disorder, depression/major depressive disorder, somatoform symptom disorder, fibromyalgia, and lumbar radiculopathy. *Id.* She described being prescribed a cane due to problems with balance, and recounted being injured at work after tripping over a telephone cord. (Tr. 27-28.) Claimant testified that back exercises did not help with her spine complaints, which extended from her lower back at waist level, down to her legs; she described the pain as a tingling sensation, and stated she felt like she could not lift up her legs when she exerts herself too much, stands or sits for longer than thirty minutes or so. (Tr. 29-30.) As to her mental-health impairments, Claimant testified that she was recently diagnosed with PTSD due to her history of being sexually abused by her stepfather; she explained that PTSD causes her to experience flashbacks when triggering events occur. (Tr. 30-31.)

As to her daily activities, Claimant testified that she is raising two of her grandsons, who are ten and twelve years old; she obtained custody of the elder grandson in 1997, followed by the younger in 2010. (Tr. 34-35.) She drives them to and from school every day, and reported she was able to drive herself from Florida to West Virginia when she moved back to the area in March 2020. (Tr. 32-33.) Claimant further testified that she can clean dishes and wash laundry by herself, but must take a break between different chores. (Tr. 30.) She has trouble lifting and carrying objects weighing more than ten pounds, such as laundry or one of her young grandchildren who weighs seventeen pounds. *Id.* She is able to prepare meals, although is hampered by dropping objects due to her carpal-tunnel syndrome; she can also wash dishes, sweep up, and clean her apartment. (Tr. 32.) She is able to go grocery shopping, provided that her grandsons carry the groceries; she stated that she "hangs on" to the shopping cart for support while navigating the grocery aisles. (Tr. 33.) Claimant explained that standing for too long,

especially on hard concrete, hurts her lower back; however, she is able to go in and out of a drugstore on her own. (Tr. 34.) Claimant testified that she watches about four hours of television per day, and occasionally waters and re-pots houseplants. She talks to a friend and family members on the phone, accesses the internet, and attends church services remotely over the internet. (Tr. 36-37.)

Turning to the effect of her impairments on her daily activities, Claimant testified that she has trouble falling asleep due to anxiety, and generally sleeps about four hours per night along with a brief afternoon nap. (Tr. 37.) Additionally, Claimant testified that she can sit for a period of two hours, and can stand for thirty minutes to one hour. *Id.* She uses her prescribed cane to help stabilize herself while standing; she testified that she was prescribed a cane by a healthcare provider at Marshall University Health in September of 2019. (Tr. 38.) She testified that she is able to walk to and from a nearby convenience store, which requires about thirty minutes of walking; however, she stated that she has difficulty climbing a large number of steps. (Tr. 39.) Claimant explained that she has lost her balance on two occasions while at her daughter's house, which caused her to fall. *Id.* She testified that she is able to reach overhead, and use a hammer to hang a photo, but she has difficulty picking up small items like coins; she experiences pain when stooping or squatting, and has trouble getting "up and down" on one knee. (Tr. 39-40.)

In response to questions from her counsel, Claimant further testified at the hearing that she has neck pain which extends to her arms; the pain worsened after she was treated with pain-management injections, and now extends to her lower back and legs as well. (Tr. 40.) Claimant explained that her left arm is "worse," but that both of her hands "go numb" all night, and that the numbness causes her to drop items like a hairbrush, phone, or dish. (Tr. 40-41.) Additionally, Claimant testified that she experiences pain in her hand

when she writes for an extended period, and as a result her handwriting is no longer legible; she also testified that she has difficulty using utensils and picking up items at times. (Tr. 41-42.) Finally, Claimant testified that she is forgetful and has memory problems; as a result, she requires help with remembering scheduled activities and appointments, and when watching television she frequently has to rewind in order to follow along. (Tr. 42-43.)

### 5. *Vocational Expert's Testimony*

After the Claimant testified, the ALJ employed a vocational expert ("VE") to aid him in determining whether Claimant could perform her past relevant work or other work. (Tr. 43-49.) The ALJ asked the VE, who testified that she is a rehabilitation specialist, to classify Claimant's past relevant work. (Tr. 43-44.) In response, the VE testified that Claimant worked as a customer-service representative, which she characterized as a position with a sedentary exertion level, as well as a business sales agent, with a light exertion level. (Tr. 44-45.) The ALJ next asked the VE if a hypothetical individual who was the same age as Claimant with the same level of education, and was halfway through a course for medical billing/coding, can perform work at the light-exertion level.[2] (Tr. 45.) The VE opined that the individual could perform Claimant's past work as a sales agent and customer-service representative, including those positions "as actually performed." (Tr. 46.)

Claimant's representative then questioned the VE. (Tr. 46-49.) He asked the VE to imagine the same hypothetical individual described by the ALJ, except that the individual

---

[2] The ALJ qualified that the definition of a "light" level of exertion was limited in scope in his hypothetical, such that the individual could stoop, crouch, crawl, kneel, balance, and climb ramps or stairs only occasionally; could never climb ropes, ladders, or scaffolds; and must avoid even moderate exposure to vibrations and hazards including unprotected heights and moving machinery. (Tr. 46.)

also experienced neck and upper-extremity pain which limited the individual to only occasionally being able to "handle, finger, and feel in the bilateral upper extremities." (Tr. 46-47.) The VE testified that these additional limitations would preclude the individual from performing Claimant's past work; however, the VE opined that there are other jobs in the national economy that the individual would be able to perform, such as a school-bus monitor. (Tr. 47-48.) Additionally, the VE testified that if the hypothetical individual were restricted to the sedentary range of exertion and was also limited to simple, routine, repetitive tasks, the individual would be precluded from being able to perform Claimant's past work. (Tr. 48-49.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir.

2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ

must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured during the relevant time period and; additionally, he noted the Agency's previous finding that Claimant "is the unmarried widow of the deceased insured worker and has attained the age of 50" and therefore "met the non-disability requirements for disabled widow's benefits" under the applicable provision of the Social Security Act. (Tr. 176.) The ALJ further found that Claimant engaged in substantial gainful activity on some occasions after the alleged onset

of her disability; specifically, he found that Claimant's work activity during the fourth quarter of 2018, and both the first and third quarters of 2019, "constituted substantial gainful activity within the meaning of the regulations" which meant that the Claimant "cannot be found 'disabled' during this period." *Id.* Further, the ALJ explained that "it appears that the Claimant's work activity during the fourth quarter of 2018, the first quarter of 2019 and the third quarter of 2019 did rise to the level of substantial gainful activity during this period." *Id.* However, the ALJ stated that, for purposes of his decision, he would proceed through the next steps of the sequential analysis "without deciding whether these earnings constituted substantial gainful employment." *Id.* As to the remaining portions of the relevant time period, the ALJ found that Claimant's work activity "did not rise to the level of substantial gainful activity" during a continuous twelve-month period; accordingly, the ALJ concluded that his remaining findings would "address the period(s) the Claimant did not engage in substantial gainful activity." *Id.*

Next, the ALJ found that Claimant's degenerative-disc disease of the cervical spine with spondylosis and stenosis, degenerative-disc disease of the lumbar spine with scoliosis, and cervical spine radiculopathy constituted "severe" impairments. (Tr. 176.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 178.) Upon assessing Claimant's RFC, the ALJ determined that Claimant had the capacity to perform "light work" as defined by the applicable regulations, except that she "can occasionally stoop, crouch, crawl, kneel, balance, and climb stairs . . . can never climb ladders . . must avoid even moderate exposure to vibrations and workplace hazards such as unprotected heights and moving machinery," and can only occasionally "finger and feel with the bilateral upper extremities." (Tr. 178-179.)

16

The ALJ concluded that given the limitations imposed by the Claimant's RFC and in light of the VE's testimony, Claimant was able to perform her past relevant work—both as "actually" and "generally" performed. (Tr. 183-184.) The ALJ also provided "alternative findings" at the fifth step, stating that "[i]n addition to past relevant work, there are other jobs that exist in the national economy that the Claimant also can perform, considering the Claimant's age, education, work experience, and residual functional capacity." (Tr. 184.) Based upon the VE's testimony, the ALJ found that Claimant would be able to perform the requirements of representative occupations such as a school bus monitor, which had 19,200 jobs nationally. (Tr. 185.) Accordingly, the ALJ concluded that Claimant was not under a disability during the relevant time period. *Id.*

The Appeals Council granted Claimant's request for review on January 4, 2022, and considered additional evidence subsequently submitted by Claimant's counsel. (Tr. 4.) On March 25, 2022, the Appeals Council entered an unfavorable decision. (Tr. 4-8.) The Appeals Council's decision agreed with the vast majority of the ALJ's decision; however, it did "not agree" with the ALJ's interpretation of the VE's testimony and attendant step-four finding that Claimant was capable of performing her past relevant work. (Tr. 6.) However, based upon the VE's testimony that "there were over 19,000 school-bus-monitor jobs in the national economy," the AC agreed with the ALJ's conclusion that "the claimant can perform a significant number of jobs existing in the national economy based on her assessed residual functional capacity ("RFC")," and therefore determined that "[t]he claimant is not disabled as defined in the Social Security Act." (Tr. 7.) The Appeals Council's March 25, 2022 decision serves as the final decision of the Commissioner of the Social Security Administration (the "Agency"). (Tr. 1.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [Agency] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Agency]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the Agency's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant's arguments before this Court are four-fold. First, she argues that the Appeals Council and the ALJ (together, the "Agency") erred by ignoring a Worker's Compensation form and Claimant's use of a cane. (ECF No. 9 at 3-6.) Second, Claimant argues that the Agency erred in evaluating her somatoform disorder and fibromyalgia, which are complex impairments that are not easily verifiable by objective means. *Id.* at 7-8. Third, Claimant argues that the Agency erred by relying solely upon one representative

occupation to find that Claimant could perform other work. *Id*. at 9-10. Finally, Claimant argues that the Agency lacked constitutional authority under the Appointments Clause to adjudicate her claims, and the matter should thus be remanded to the Agency for de novo proceedings before properly-appointed Agency officials. *Id*. at 11-12. In response, the Agency disputed Claimant's arguments and argued that the Agency's determination should be affirmed. (ECF No. 13.) Finally, Claimant's Reply brief challenged the basis for the Agency's response. (ECF No. 15.)

### A.  *Agency's Evaluation of the Evidence*

Claimant's first argument centers upon the Agency's consideration of two pieces of evidence: a September 3, 2019 Workers' Compensation form, and Claimant's use of a cane prescribed by a healthcare professional to assist with her ambulation.

#### 1.  *Workers' Compensation Form*

While the author of the form at issue is disputed between the parties, they each agree that a September 3, 2019 form entitled "West Virginia Workers' Compensation Employees' and Physicians' Report of Occupational Injury or Disease" was completed by a healthcare professional who examined the Claimant. (Tr. 411.) Claimant's position is that the Agency's failure to evaluate this opinion automatically warrants remand. In support of her position, she cites to 20 C.F.R. §§ 404.1520c, 416.920c, which requires the Agency to make a finding as to the persuasiveness of a medical-source opinion and explain the basis for such a finding; additionally, Claimant cites to Social Security Ruling (SSR) 96-8p, 1996 WL 374184, which requires an RFC to "consider and address medical source opinions."  If the ALJ's RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Claimant's position assumes, however, that the Workers' Compensation form falls within the scope of a medical-source opinion. The Court is not convinced under the circumstances at hand. The applicable regulations define a medical opinion as "a statement from a medical source about what a claimant can still do despite his or her impairment(s) and whether he or she has one or more impairment-related limitations or restrictions." 20 C.F.R. § 404.1513.

Here, the subject form stated that Claimant was restricted from lifting more than five pounds or sitting/standing for prolonged periods "until" Claimant followed up with Marshall Health Neurology. (Tr. 411.) Furthermore, the form stated that Claimant was released to return to work in four days' time, on September 7, 2019. *Id.* at Section II, Subpart 5. Tellingly, Claimant omitted mention of these qualifications in her briefing. Taken as a whole in light of the record evidence, Claimant did not demonstrate that this expressly conditional, temporally-limited restriction on a one-page Workers' Compensation form extended beyond the Claimant's follow-up appointment with her neurologist. Claimant has simply failed to demonstrate that the subject form constituted a medical opinion such that its omission from the Agency's written decisions contravened the requirements set forth in the regulations and rulings she cited. While the Agency must consider all evidence of record, it is well-established that the Agency is not required to discuss every single shred of other evidence.

The Court also finds it significant that Claimant failed to point to *any* evidence on the record to support a finding that she was unable to lift less than five pounds or sit/stand for a prolonged period. To the contrary, Claimant herself testified that she was able to lift up to ten pounds, and that she was able to make a thirty-minute trip to and from a nearby convenience store. The Court **FINDS** that the Agency's decision was supported by

substantial evidence, and the Agency would have reached the same result if it had evaluated the form at issue. Thus, Claimant's assertion that the Agency's omission of this form in its written decisions was not harmless error fails, and the undersigned **FINDS** that Claimant did not demonstrate reversible error. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (explaining that an error is harmless where the ALJ would have reached the same result notwithstanding an initial error).

### 2. *Use of Cane Prescribed by Healthcare Provider*

Claimant also alleges error in the Agency's failure to evaluate Claimant's use of a cane for balance and ambulation. (Tr. 4-8, 173-85.) Claimant points to her testimony that she was given a prescription for a cane in September 2019 due to problems with her balance, and her medical records confirm she was prescribed the use of a cane in October 2019 "to help with ambulation." (Tr. 27, 584). In support of her argument, Claimant points to several Agency regulations and rulings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00J.4 (stating that the use of a cane means that at least one upper extremity is not available for carrying); SSR 96-9p, 1996 WL 374185 *7 (suggesting that use of a cane is, at best, consistent with "sedentary" work). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(J)(4) (providing that an individual's ability to lift, carry, push, and pull may be impacted by their use of a cane).

While the logic of Claimant's argument is sound, it is simply not borne out by the record. As the Appeals Council acknowledged, Claimant was indeed prescribed the use of a cane on October 16, 2019. (Tr. 5.) However, the record evidence is largely devoid of any evidence that Claimant actually used her cane. To the contrary, as the Appeals Council explained, Claimant "maintained the ability to perform various activities using her hands including folding laundry." *Id.* While Claimant did testify that she used her cane, her

medical records largely omit any mention of it. Furthermore, Claimant's testimony regarding her daily activities contradicts her representation; she explained that she was able to shop at the grocery store with a cart, and testified that she could clean dishes, wash laundry, lift and carry objects weighing less than ten pounds, prepare meals, sweep up, and clean her apartment—all with no mention of a cane. (Tr. 32-33.)

As this Court has previously found, the mere fact that an individual has a prescription for a cane does not automatically establish that its use is medically required. *See Peake v. Berryhill*, 2018 WL 1178256, at *15 (S.D. W. Va., 2018) (explaining that the prescription of a cane "is not the end of the inquiry"). In fact, fellow district courts within the Fourth Circuit have held that substantial evidence may support the conclusion that a prescribed cane is not medically necessary, and thus an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not per se erroneous. *Id.* (internal citations omitted).

This is particularly true when, like the Claimant here, a claimant fails to point to documentation or evidence beyond the mere prescription. *See id.* Claimant's October 2019 neurology appointment is the only time a cane or any assistive device is mentioned in the medical evidence. Tellingly, in her brief, Claimant fails to identify a single instance where she was observed using a cane. Further, she did not point to any medical opinion indicating a cane was medically necessary, much less one stating "the circumstances for which it is needed" in accordance with the applicable Agency rulings and regulations. *Id.* *See also* SSR 96-9p, 1996 WL 374185 at *7. As Claimant has failed to provide any evidence that satisfies the medical necessity requirements of SSR 96-9p and both the ALJ and the AC reasonably found a limitation for cane use unsupported by the record, the Court **FINDS** that Claimant did not demonstrate reversible error.

**B.  *Evaluation of Claimant's Non-Severe Impairments***

Claimant next argues that the ALJ did not properly consider Claimant's fibromyalgia, somatic disorder, or carpal-tunnel syndrome when formulating the RFC finding subsequently adopted by the Appeals Council.

As to Claimant's fibromyalgia and mental-health impairments, Claimant accurately pointed out that the ALJ relied upon the lack of objective medical findings. (Tr. 179-83; see, e.g., Tr. 701, 727, 733, 747, 891.) The Court agrees with Claimant that reliance on such "objective" evidence is inappropriate in the context of impairments such as fibromyalgia and complex depression, because often these impairments do not produce objective evidence of symptoms; accordingly, the Agency may not reject a claimant's subjective complaints simply because the objective medical evidence does not confirm the extent or severity of the claimant's symptoms. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97 (4th Cir. 2020); *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341 (4th Cir. 2023).

However, a diagnosis of fibromyalgia or depression does not render a claimant per se disabled. While "a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can be reasonably be expected to cause the pain the claimant alleges she suffers." *Lasharne W. v. Comm'r, Soc. Sec. Admin.*, 21-cv-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023). The ALJ expressly stated that his conclusions were not based exclusively on objective medical findings, but included consideration of "the total medical and nonmedical evidence," including testimony and statements by

Claimant and others, a function report, and other record evidence regarding Claimant's activities of daily living, behavior and habits. (Tr. 32-33, 182, 553-60.) The ALJ supported this assertion by pointing to extensive record evidence of inconsistencies with Claimant's allegations regarding the limiting effects of these impairments.

The impropriety of relying upon objective medical evidence of *symptoms* does not mean that the Agency must ignore any evidence whatsoever in Claimant's medical records. Here, the ALJ appropriately observed that Claimant was treated conservatively; for instance, no treatment was recommended upon Claimant's fibromyalgia diagnosis in February 2020. (Tr. 182, 747.) Likewise, the ALJ acknowledged that Claimant was diagnosed with somatoform disorder in January 2019, but he discussed at length the evidence of Claimant's positive response to conservative mental-health treatment; additionally, while objective medical evidence is not relevant, the Agency properly noted that Claimant's own *subjective* presentation in mental-status examinations was unremarkable. (Tr. 180, 711, 706, 709, 713.)

In addition to this medical evidence, the ALJ discussed Claimant's unusually extensive activities of daily living, which included Claimant's testimony that she was able to cook, do laundry, shop for groceries, care for her two grandchildren, and socialize with others; additionally, he noted Claimant's testimony that she was able to drive a car from Florida to West Virginia—which categorically involves traveling for over five hundred miles over a period of many hours. (Tr. 127-28, 146-47, 165, 182.)

Finally, following his consideration of all Claimant's medically determinable impairments[3] and the record evidence, the ALJ explained his finding that Claimant

---

[3] Claimant asserts that the Agency never specified whether Claimant's fibromyalgia or carpal-tunnel syndrome ("CTS") impairments were non-severe or not medically-determinable. (ECF No. 9 at 7-8.) This

could perform a range of light work (Tr. 183.) The ALJ explained that Claimant's allegations were inconsistent with the nonmedical evidence, again finding that her extensive daily activities suggested a "level of concentration inconsistent with a disabling level of pain." (Tr. 182.) The ALJ also noted that Claimant's condition improved with medications and that "her mental status exams have been entirely within normal limits except for occasional anxious or depressed mood." *Id.* The ALJ's conclusion that the longitudinal record did not support the debilitating symptoms as alleged by Claimant, and instead supported his RFC finding, was thus supported by substantial evidence. *Id.* Thus, the ALJ appropriately "buil[t] an accurate and logical bridge from the evidence to h[is] conclusion[s]" regarding the extent to which Claimant's impairments impacted his ability to engage in substantial gainful activity sufficient to permit meaningful judicial review, which was adopted by the Appeals Council.

Claimant's reliance on *Arakas*, 983 F.3d at 83, is therefore misplaced. (Tr. 9 at 10-11.) In *Arakas*, the ALJ found at step two of the sequential evaluation process that the claimant's fibromyalgia was a severe impairment. *Id.* at 94. The ALJ assessed the claimant's RFC and found that she retained the ability to perform light work with

---

assertion is not completely accurate, however, as the ALJ did identify Claimant's bilateral CTS and fibromyalgia in his step-two finding, and identified both of these impairments as well as Claimant's fibromyalgia as medically-determinable impairments at Claimant's hearing. (Tr. 26.) The Agency agreed with the ALJ that while Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" of these three impairments, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 119.) Moreover, even if these impairments should have been more clearly designated as "nonsevere," this Court has held that an error at step two is harmless when the ALJ found at least one severe impairment, proceeded with the sequential evaluation, and considered the effect of the challenged impairment at subsequent steps of the analysis. *Cook v. Colvin*, 2016 WL 5661348, at *9 (S.D.W. Va., 2016) (collecting cases.) As the ALJ discussed Claimant's fibromyalgia and bilateral carpal tunnel syndrome along with her other medically determinable impairments in formulating Claimant's RFC, the undersigned **FINDS** no error on this basis.

postural and environmental restrictions. *Id.* In so finding, the ALJ discounted Arakas's subjective complaints of pain and fatigue due to fibromyalgia, and specifically found that these complaints were "not reliable" and "not completely consistent with the objective evidence." *Id.* In reversing the ALJ's decision, the Fourth Circuit explained that the ALJ erred in placing "undue emphasis on Arakas's normal clinical and laboratory results" in evaluating the degree to which the claimant's subjective complaints should be credited in the face of a severe medically-determinable impairment of fibromyalgia. *Id.* at 97. The Fourth Circuit also held that the ALJ had wrongly discounted the treating physician opinions and mischaracterized evidence about Arakas's activities in discounting her subjective complaints. The Fourth Circuit thus held in *Arakas* that "[w]e simply cannot uphold a decision plagued by so many errors." *Id.* at 111.

In contrast to *Arakas*, Claimant in this action cannot demonstrate that the ALJ "discounted" her subjective complaints; unlike *Arakas*, the ALJ here did not "effectively require[ ]" objective evidence or offer objective medical evidence as the "chief" or "definitive" reason to discount the intensity of Claimant's complaints. Instead, as discussed above at length, the ALJ evaluated Claimant's diagnoses and treatment in conjunction with her other impairments, and found the record was not consistent with Claimant's allegations; in addition, the ALJ supported his findings with citations to extensive record evidence. (Tr. 179-83.) In contrast, the only evidence Claimant cites in support of her position is a citation to the somatic disorder listing and the definitions of somatoform disorder from WebMD and the Eighth Circuit (ECF No. 9 at 6-7.)

The ALJ's assessment of Claimant's CTS likewise adequately permitted meaningful review and is supported by substantial evidence. The ALJ discussed his

consideration of Claimant's subjective complaints relating to her CTS, which included record evidence that Claimant's treatment was "essentially routine and conservative in nature," primarily limited to medications, occasional lumbar-facet injections, and a brief stint of physical therapy. (Tr. 179-183, 676, 772-780.) The ALJ also noted that Claimant had an EMG performed in November 2018 that reflected only mild bilateral carpal tunnel syndrome, and pointed to the occasional findings of reduced grip strength in the records. (Tr. 180, 657, 727, 862.)

In summary, the Agency's discussion appropriately permits meaningful judicial review. While Claimant may disagree with the Agency's assessment, Claimant has not demonstrated that the Agency's evaluation of the evidence constituted reversible error; nor may she ask the Court to reweigh the evidence and arrive at a different conclusion. *See Estep v. Richardson*, 459 F.2d 1015, 1017 (4th Cir. 1972) ("if supported by substantial evidence, [the decision] must be affirmed even though the reviewing court believes that substantial evidence also supports a contrary result"). Under the circumstances, the undersigned **FINDS** that Claimant has not demonstrated reversible error.

### C. Adequacy of the Agency's Step-Five Determination

Claimant next contends that both the ALJ and the Appeals Council ("AC") erred in their step-five findings by relying solely upon one representative position. Specifically, at the hearing, the VE testified that an individual with Claimant's background and RFC could perform the job of school bus monitor, and 19,200 of these jobs existed in the national economy; the Agency relied upon this testimony in making its step-five finding. (Tr.48, 185.) While Claimant argues that one representative position is not adequate to demonstrate there are a significant number of jobs in the national economy that she could

perform, she ultimately fails to identify any error in the Agency's determination that Claimant could perform other work.

The applicable regulations require the ALJ to determine whether a significant number of other work exists in the national economy that a claimant can perform. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1566(a), 416.920(a)(4)(v), 416.966(a); see *Sawyers v. Kijakazi*, 2021 WL 4256826, at *7 (S.D. W. Va. Sept. 30, 2021) (explaining that the ALJ satisfies his burden at step five so long as he identifies at least one occupation existing in significant numbers in the national economy that the claimant can perform). When faced with a "complex" issue regarding whether there is available work in significant numbers in the national economy, the ALJ may consult a VE, just as the ALJ did in the case at hand. *See* 20 C.F.R. §§ 404.1566(a), 416.966(a); SSR 00-4p.

As the Supreme Court has explained, VE testimony regarding the number of jobs available in the national economy will "handily" clear the "more-than-a-mere-scintilla threshold" absent evidence within the administrative record that the VE's testimony "lack[ed] . . . markers of reliability." *See Biestek*, 139 S. Ct. at 1157. There is no specific numerical definition for "significant numbers in the national economy," but the Fourth Circuit has described 110 jobs within a region as being "not insignificant." *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979); *see also Hodges v. Apfel*, 99-2265, 2000 WL 121251, *1 (4th Cir. 2000) (holding that 153 jobs "suffice[d] to defeat [the Claimant's] claim for disability benefits"). In fact, district courts within the Fourth Circuit—including this Court—have indicated that as few as 3,000 jobs in the national economy could qualify as significant. *See Critchley v. Colvin*, No. 5:15-CV-08288, 2016 WL 3030211, at *8 (S.D. W. Va. May 4, 2016) (citing with approval to an out-of-circuit case for the proposition that 3,000 jobs in the national economy was a significant number); accord *Aquino-Hernandez*

28

*v. Saul*, No. CV 9:19-582-CMC-BM, 2020 WL 4678823, at *5 (D.S.C. Mar. 11, 2020) (finding 3,000 jobs to qualify as a significant number of jobs in the national economy).

Against this backdrop, Claimant's contention that the Agency failed to satisfy its step-five burden is meritless. Claimant did not dispute the accuracy of the number of bus-monitor positions to which the VE testified, and she solely cites to POMS DI 25025.030 to support her argument that the Agency must cite at least three occupations that the Claimant could perform. (ECF No. 9 at 10.) Claimant sidesteps the fact that the same POMS section expressly states that an ALJ "may cite to fewer than three occupations when it is clear that jobs exist in significant numbers within fewer than three occupation(s)," and that an ALJ may "[m]ake this determination using vocational specialist advice" and the regulations. POMS DI 25025.030(C)(1). That is precisely what the Agency did here, relying upon on "vocational specialist advice" in finding there were 19,200 jobs Claimant could perform; these numbers more than satisfy its step-five burden.

Claimant argues that it is not clear Claimant could even perform this job, as the ALJ found that she had non-severe mental health limitations. (ECF No. 9 at 10.) Claimant argues that these "mild" mental limitations should have resulted in an additional, unspecified social-interaction limitation that precludes work as a school bus monitor. *Id.* (Id.). However, Claimant fails to support this argument. Accordingly, the Court **FINDS** that the Agency's determination Claimant could perform other work in the national economy was supported by substantial evidence, and Claimant has not demonstrated reversible error.

### *D. Legal Validity of Agency Appointments*

Lastly, Claimant argues that remand is required because "the ALJ and Appeals Council members were not properly appointed" pursuant to federal statute as well as the Appointments Clause of the United States Constitution. (ECF No. 9 at 11.) Claimant emphasized that Ms. Berryhill began serving as Acting Commissioner on January 20, 2017, and was replaced by then-Commissioner Saul on June 17, 2019. *Id.* Claimant argued that Ms. Berryhill's term as Acting Commissioner expired after 210 days pursuant to the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a), and therefore Ms. Berryhill's appointment of appeals-council and ALJ positions in 2018 are invalid and warrant remand. *Id.* at 11-12. In support of her argument, Claimant relied on two 2022 opinions from the U.S. District Court for the District of Minnesota: *Brian T. D. v. Kijakazi*, 2022 WL 179540 (D. Minn. Jan. 20, 2022), and *Richard J.M. v. Kijakazi*, 2022 WL 959914 (D. Minn. Mar. 30, 2022). *Id.* at 12.

As the Commissioner explained in response to Claimant's argument, however, the Eighth Circuit—in which the U.S. District of Minnesota sits—expressly rejected the approach taken by the District of Michigan in *Dahle v. Kijakazi*, 62 F.4th 424, 426 (8th Cir. 2023), explaining that the FVRA permits an acting official to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired. *Dahle*, 62 F.4th at 429-430. The Eighth Circuit held, therefore, that Ms. Berryhill was validly serving as Acting Commissioner when she ratified the appointments of Administrative Law Judges for the Agency and approved them as her own. *See id*. Thus, the authority upon which Claimant's FVRA argument relied no longer supports her position.

Moreover, the Fourth Circuit has now ruled on the issue. On April 11, 2023, the United States Court of Appeals for the Fourth Circuit published *Rush v. Kijakazi*, 65 F.4th 114, 118-124 (4th Cir. 2023), setting forth controlling precedent in favor of the Commissioner's position. In *Rush*, the Fourth Circuit joined the United States Court of Appeals for the Eighth Circuit in holding that the FVRA permits an acting official to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired. *See id.* The Fourth Circuit held, therefore, that Nancy Berryhill was validly serving as Acting Commissioner when she ratified the appointments of Administrative Law Judges for the Agency and approved them as her own. *See id.* Given this controlling precedent, the undersigned **FINDS** that Claimant's FVRA claim fails as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Claimant's request to reverse the Commissioner's decision (ECF No. 9) is **DENIED**, the Commissioner's request to affirm her decision (ECF No. 13) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

**IT IS SO ORDERED.**

The Clerk is **DIRECTED** to file this Memorandum Opinion and Order and to transmit a copy of the same to counsel of record.

ENTER: September 29, 2023

Dwane L. Tinsley
United States Magistrate Judge